## HENRY F. EAMES *et al.*

### *v.*

## ISAAC N. HARDIN *et al.*

*Filed at Springfield September 27, 1884.*

1. MORTGAGE—*of a deed absolute in form—whether a purchase and a sale, or a loan—degree of proof required.* To establish a deed absolute in form a mortgage, the proof must be clear and convincing. It may be shown by verbal testimony, but it must be entirely satisfactory, if not conclusive.

2. Certain lots of a part owner having been sold at a judicial sale more than twelve months, he employed another to obtain the certificates of purchase and acquire the title, under an agreement on his part to purchase the same at an advance of $2000 on the sum required to be paid, besides the legal rate of interest, to enable him to perform a contract of sale to another. He also conveyed other land to the purchaser as a security for his performance of the contract to re-purchase the lots. It was *held*, that the advances made to acquire the title to the lots were not a loan, and the title so acquired was not in the nature of a mortgage, and that there was no usury in the transaction.

3. One person may purchase land of another under an agreement to sell it back to the latter on a stipulated price in advance of its cost, and such a purchase and re-sale will be sustained when it is made in good faith, and is not resorted to to evade the usury laws, and the transaction is not tainted with fraud. And the conveyance of other property as a security for the re-purchase, at the contract price, will not render the transaction a loan and mortgage. A party purchasing property for another may take additional security to protect himself against loss.

4. USURY—*profit on purchase of land for another.* Where one party in good faith purchases property for another, to be conveyed to the latter on an advance of the price it cost, there can be no question of usury, and the title so acquired can not be held as a security for a loan. The profit on the purchase in such case is not usury. Nor will the taking of security for the performance of the contract to purchase, render the transaction a loan to the person agreeing to purchase.

5. TRUST—*as to title to land procured at the instance of another, and for his benefit.* A prior owner of lots sold at judicial sale made an agreement with A that the latter should obtain the certificates of purchase, and thus acquire the legal title. The holder of the certificates of purchase of part of the lots refused to sell them, and the former owner procured the money from B to redeem them, and confessed judgment in favor of A, under which their redemption was made with the money so advanced by B. It was

*held,* that A held the title to the latter lots as trustee, and that the former owner, at whose instance the redemption was made, could not afterward make an agreement with A pledging such lots for the payment of the taxes on the other lots, to the prejudice of B.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

This was a suit in chancery instituted by Isaac N. Hardin and others, against Henry F. Eames and Jesse Spaulding, to redeem certain premises under a transaction claimed to be a loan and mortgage.

Messrs. McCAGG & CULVER, for the appellants:

The contract between appellants and Hardin did not constitute a mortgage, nor was it usurious. Tyler on Usury, 92; *Cram* v. *Hendricks,* 7 Wend. 569; *Rapleye* v. *Anderson,* 4 Hill, 472; *Lloyd* v. *Scott,* 4 Pet. 205; *Moore* v. *Howland,* 4 Denio, 264; *Thurston* v. *Cornell,* 38 N. Y. 281; *Smith* v. *Marvin,* 27 id. 137; *Condit* v. *Baldwin,* 21 id. 219; *Bank of the United States* v. *Waggener,* 9 Pet. 399; *Hammet* v. *Yea,* 1 Bos. & Pul. 144; *Hogg* v. *Ruffner,* 1 Black, 115; *Brooks* v. *Avery,* 4 N. Y. 225; *Jones* v. *Berryhill,* 25 Iowa, 295; *Ketcham* v. *Barber,* 4 Hill, 224; *Kitchel* v. *Schenck,* 29 id. 515; *De Forest* v. *Strong,* 8 Conn. 513; *Beckwith* v. *Windsor Manf. Co.* 14 id. 594; Abbott on Trial Evidence, 794; *Murray* v. *Harding,* 2 W. Blacks. 859; S. C. 3 Wils. 390; *Arnold* v. *Gifford,* 62 Ill. 249.

The sale of the seven lots to Trumbo was authorized by Hardin, and he should have been held concluded by it. His consent, once given, operated as an estoppel. *Carpenter* v. *Falter,* 4 Bradw. 45; Bigelow on Estoppel, 590, 600; *Cairncross* v. *Lorimer,* 7 Jurist, (N. S.) 149; 3 Macy, H. L. Cases, 829; *Cornish* v. *Abington,* 4 H. & N. 549; *Smith* v. *Newton,* 38 Ill. 235; *Cochran* v. *Harrow,* 22 id. 345; *International*

*Bank* v. *Bowen,* 80 id. 541; *Kinnear* v. *Mackey,* 85 id. 96; *Freeman* v. *Cooke,* 12 Jurist, 777.

There was no revocation of Hardin's consent. Story on Bailments, sec. 208; *Salte* v. *Field,* 5 T. R. 211; *Bowerbank* v. *Morris,* Wall. 118 a; 16 Viner's Abridg. 4, part 7.

It was error to decree that lots 11, 12 and 13 be conveyed to Hardin. In this respect the decree neither comported with the facts, nor did it conform to the prayer of the bill. *Ward* v. *Enders,* 29 Ill. 519; *Hall* v. *Towne,* 45 id. 493; *Dodge* v. *Wright,* 48 id. 382.

Messrs. DENT, BLACK & CRATTY BROS., for the appellees:

The transaction between Hardin and appellants was in reality but a mortgage. *Reigard* v. *McNiell,* 38 Ill. 400; *Hanford* v. *Blessing,* 60 id. 352; *Price* v. *Karnes,* 59 id. 276; *Ewart* v. *Walling,* 42 id. 453; *Wynkoop* v. *Cowing,* 21 id. 570; *Klock* v. *Walter,* 70 id. 416; *Strong* v. *Shea,* 83 id. 575; *Dennis* v. *McCagg,* 32 id. 439; *Smith* v. *Cremer,* 71 id. 185; *Sutphen* v. *Cushman,* 35 id. 136; *Davis* v. *Hopkins,* 15 id. 519; *Bartling* v. *Brasuhn,* 102 id. 441; *Russell* v. *Southard,* 12 How. 139.

The transaction being a loan and mortgage, was, as to the sum of $2000, usurious. *Delano* v. *Rood,* 1 Gilm. 690; *Heytle* v. *Logan,* 1 A. K. Marsh. 529; *Davis* v. *Hopkins,* 15 Ill. 519; *Payne* v. *Newcomb,* 100 id. 611; Tyler on Usury, 102.

The sale of the property not under a decree or by consent, was unauthorized. *Hart* v. *Ten Eyck,* 2 Johns. Ch. 101, and cases cited.

Upon such a wrongful and unauthorized sale, the mortgagees, acting in violation of the established duties of the trust relation in which they stand to the mortgagor, must account for the full value of the property so sold, regardless of the price obtained. *Waite* v. *Dennison,* 51 Ill. 319; Hill on Trustees, *522; Perry on Trusts, sec. 847, and cases cited; *Freeman* v. *Cook,* 6 Ired. Eq. 373; *Ames* v. *Downing,* 1 Bradf.

Sur. 321; *Dennis* v. *McCagg*, 32 Ill. 429; *Johnson* v. *Lewis*, 2 Strob. Eq. 157; *Moore* v. *Titman*, 44 Ill. 367; *Norman* v. *Cunningham*, 5 Gratt. 64; *Mansell* v. *Mansell*, 2 P. Wms. 678.

If the situation of the title to this property was such that appellants could dispose of it at pleasure, in disregard of their contract with Mr. Hardin, such disposition would amount to an appropriation of the property by them, which would operate in law as a satisfaction of the mortgage debt, at least to the full value of the property so taken and disposed of. *Perry* v. *Barker*, 8 Ves. 527 a; S. C. 13 id. 198; *Burpee* v. *Parker*, 24 Vt. 567; *Sutphen* v. *Cushman*, 35 Ill. 197.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

The decision of this case may be turned alone on the question whether this was a purchase by appellants of the seven lots, and a sale thereof to Hardin, or was the money advanced to Hardin as a loan, and the purchase of the lots to be held by appellants as a pledge, or as security for the payment of the money.

The entire transaction has every form of a purchase and sale. These seven lots, with three others, had been sold under a decree of foreclosure of a mortgage, and the time for redemption from the sale was near expiring, when Hardin applied for the loan. Hardin says, in his testimony, that the ten lots were sold in November, 1876, "and about fourteen months had intervened thereafter, up to the middle of January, about when I went to see Eames." He further says: "I had before then communicated to Eames and Spaulding the date at which the fifteen months for redemption would expire, and had taken Spaulding to see Mattox and Barnes. As to the Hyde lots the redemption expired February 22, and the other lots on the 23d, the Hyde lots being 11, 12 and 13." He further testified: "Some days prior to the 22d or 23d of February, the time for redemption, they pro-

posed that I should deed them the eighty acres, and give a quitclaim of the Thirty-ninth street lots, and they would enter into a written contract with me in relation to conveying the property upon the payment by me of the sum advanced." He further testified: "I don't know whether, at that time, the sale in bankruptcy of Warren's title had taken place or not. If not, the title was in Warren, subject to his incumbrance to our firm. Warren had not conveyed to me, except by trust deed securing his notes to us, which were given in payment of the property, no cash having been paid by him. The title to the lots was in Warren, unless sold out in bankruptcy."

Thus it is seen that the title was in Warren at the time the lots were sold under the decree of foreclosure, and until the expiration of twelve months after the sale, and not in Hardin. His right to redeem these lots, under the trust deed given by Warren to Hardin, from this foreclosure sale, was cut off and foreclosed by that sale, under the decree and expiration of twelve months thereafter. Neither he nor Warren had left any interest, either in law or equity. Hardin's position to these lots at that time was that of a stranger, or that of a grantor who has sold and conveyed his land to another. But Hardin and Cushman at the time had an arbitration pending, for the settlement of large transactions between them, in which the former expected the arbitrators would award a large price on these lots to be paid by Cushman, who had previously agreed to take them of Hardin. He was therefore exceedingly anxious to obtain the title, so as to turn the lots over to Cushman at the anticipated large price. He therefore applied to Eames for a loan, for the purpose of purchasing the certificates of sale given by the master in chancery for the lots. Eames, being the president of the Commercial National Bank, laid the proposition before the directors, and they declined the loan. Thereupon Hardin saw Spaulding, when it was agreed by the three that Eames

and Spaulding should furnish the money, purchase the certificates of purchase on the ten lots, and sell them to Hardin for the cost and $3000 advance, to be paid by him in ninety days,—Hardin to pay Shepherd for examining the title and consummating the contract. On the effort to purchase, Shepherd was able to procure the certificate of the master to but seven of the lots,—from 4 to 10, inclusive. The holder of the master's certificate for lots 11, 12 and 13 declined to sell. It was thereupon arranged that Eames and Spaulding should leave out the three lots and purchase the certificate for the seven, and Hardin was to pay $2000, instead of $3000, over and above what the certificates therefor should cost. This arrangement was carried out, Eames and Spaulding paying between $14,000 and $15,000 for the certificate of purchase for the seven lots, and they afterward obtained a master's deed for them, and Hardin at the same time executed to them a quitclaim deed. A writing was entered into by the parties on the 24th day of February, 1877, binding the parties to the agreement. Eames and Spaulding agreed to convey these seven lots to Hardin on his payment of the sum of $16,923.10, with interest, within ninety days from that date. Also, an eighty-acre tract which Hardin had procured to be conveyed to Eames and Spaulding as security for the performance of his part of the contract. Time was made of the essence of the contract. Hardin gave his notes for the purchase money, payable in ninety days. When it was found that the master's certificate for lots 11, 12 and 13 could not be purchased, Hardin confessed a judgment, procured the money, and caused a redemption to be made of the three lots, and they were purchased in Spaulding's name, and the lots were deeded to him by the sheriff. Eames and Spaulding finding the eighty acres of land heavily incumbered, insisted that Hardin should have other real estate conveyed to them as further security for the performance by Hardin of his part of the agreement. He accordingly had a number of other lots conveyed to them for

the purpose. Eames and Spaulding advanced large sums of money to relieve the eighty acres of land from incumbrance. They also received, on a judgment Hardin had recovered against Cushman, $4496.52. Hardin failed to make any other payment, and Eames and Spaulding, being desirous of obtaining their money, through Hise, a real estate broker, sold the seven lots to Trumbo for $10,500, one-half in cash, and the other half on time. Hardin filed his bill to redeem, and appellants filed a cross-bill for the sale of the securities they held on the eighty acres of land, and on the other lots. On a hearing, the Superior Court held that the transaction was a loan, and the conveyance by the master to appellants was a mortgage to secure the loan, and that the $2000 Hardin was to pay over and above the cost of the lots was usury, and that appellants should account for the value of the lots sold to Trumbo, and referred the case to a master to state an account. The master stated the account, and allowed Hardin $21,000 for the seven lots, and reported a balance against appellants, and the court decreed that they pay to Hardin the sum of $5889.16, with interest at the rate of six per cent from the first day of March, 1878. They appealed to the Appellate Court for the First District, where, on a hearing, the decree of the Superior Court was affirmed, and they bring the case here by appeal.

All cases hold, that to establish a deed absolute in form a mortgage, the proof must be clear and convincing. It is never done on vague and inconclusive evidence. It may be proved by verbal testimony, but it must be entirely satisfactory, if not conclusive. Does the evidence in this case clearly establish that the master's deed to appellants was intended by the parties as a mortgage to secure a loan of money? Can it be fairly held there was a loan? If there was not, then the decree of the Superior Court is erroneous.

There is nothing in the form of the transaction to indicate that there was a loan of any sum whatever. On the con-

trary, it appears to have been a purchase of these lots by appellants, at the urgent solicitation of Hardin, with an agreement that he would purchase them at an advanced price from appellants. Surely no one can be found who will deny that the parties had the power to agree that appellants should purchase, and sell the property to Hardin, without the transaction becoming a loan, and a mortgage to secure the payment of the sum advanced to make the purchase. The doctrine is well settled that a party may purchase land for another, take the deed in his own name, and bind himself to convey it to the person at whose instance it was purchased, on being paid the purchase price agreed upon between the parties. The doctrine is well established that one person may purchase land of another, and sell it back to him on the payment of a stipulated price. Such purchases and re-sales are always sustained where the transaction is in good faith, and is not resorted to for the purpose of evading the usury laws, or the transaction is not tainted with fraud. This doctrine is so familiar that it requires the citation of no authority in its support. Suppose Hardin had requested appellants to purchase a number of lots from a person with whom he had no relations, or with the title to which he had never been connected, and he had agreed to purchase the lots from them, as he did in this case, would any one even suspect that it was a mere loan and security? Surely not. And where is the difference, in principle? We are wholly unable to perceive the shadow of difference. When appellants purchased the master's certificates, Hardin's relations to the property had ceased. He was then a stranger to the title. He expected, if he could control the title, to be able in a short time to turn the lots over to Cushman at a large profit on the price he agreed to pay for them; but Cushman having become insolvent, and unable to take and pay for the lots, and they, like all other property, doubtless having appreciated largely in value, he now is endeavoring to turn the transaction into

a loan and mortgage, and thus make of appellants a portion of the profits he expected to, but did not, realize from Cushman. Spaulding most emphatically denies that there was, or was intended to be, a loan and mortgage, but testifies that it was a purchase of the certificates, and a sale of the lots to Hardin. Eames is equally explicit in his testimony that it was a purchase and sale, and not a loan and mortgage. They both testify that there was no agreement or understanding whatever that it was, or should be, a loan. But independent of their testimony, Shepherd's is amply sufficient to establish it as a purchase and sale, and not a loan. He was the attorney who investigated the title, and under whose advice every step was taken until the agreement was executed. He had every opportunity of learning the intention of the parties, and he says it was a purchase by appellants, and a sale to Hardin; that this was the understanding of himself from communications with all the parties, and they all so understood and intended it; that there was no intimation from any one that it was intended to be a loan, and he had daily conferences in reference to the matter with Hardin. Had such been his intention he surely would, at the very least, have intimated it to Shepherd. He testifies that he understood from all parties that it was a purchase and sale, and he drew the papers and transacted all of the business to render it such. If this evidence does not establish this transaction to be a purchase and sale, and not a loan and security, we are at a loss to understand by what possible means there can be a purchase and sale. If this is held a loan and security, we might as well announce that there can be no such thing as a purchase and sale, or re-sale. Even Hardin says: "The final arrangement between us was embodied in the written memorandum introduced in evidence, which was signed by me. I read it before it was signed, and knew what was in it, perfectly well." If the agreement, as he says, embodied the arrangement, then how can it be a loan and

security? The agreement is plainly and simply a sale. The language can not be tortured into a loan and security. He says it expressed the agreement of the parties, and it is simply a contract to sell by appellants and to purchase by Hardin.

The facts in this case are as strong as in *Magnusson* v. *Johnson,* 73 Ill. 156, *Hanford* v. *Blessing,* 80 id. 188, and *Caprez* v. *Trover,* 96 id. 456, in all of which the transactions were held to be sales and re-purchases. This case falls clearly within the principles announced in those cases, and should be governed by them.

But it is said, if it was a sale why did appellants require the eighty acres to be conveyed to them, and embraced in the agreement to convey to Hardin? Appellants did not purchase the property to hold, but they purchased it for Hardin. They, as a matter of prudence, desired to provide against any contingency of being required to hold the property. They, of course, wished to be secure against having to hold the lots, and run the risk of never being able to obtain their money from their sale; hence, as they were purchasing for Hardin, they desired to be fully assured that he would pay for and receive the title to the lots. It was to compel Hardin to perform his agreement, or on a default on his part to have abundant means out of which to realize the money they advanced to procure and protect the title. Surely it could not be expected that a prudent business man would advance large sums of money to purchase unproductive land not in demand in the market, to its full value, or more, and rely on it alone to be reimbursed for his outlays. Had appellants relied alone on these seven lots to obtain the money they had paid to procure and protect the title, they would have almost surely lost money; hence they, as all prudent business men would have done, determined to be fully secured against Hardin's breach of contract. This was legal, and did not render them liable to forfeiture or loss upon their advances. There was

therefore no usury, and there was no forfeiture of interest on the money they paid for the title, and to remove incumbrances from the property conveyed to them to secure them against a breach of contract by Hardin. Had Hardin paid any considerable part of the purchase money down, then perhaps no necessity would have existed for taking a lien on other property to secure the performance of the contract; but such was not the case. Hardin paid nothing down. Suppose Hardin had proposed to give appellants $16,000 if they would procure title and convey these seven lots to him, would any person suppose that would be a loan or security? And if on such an offer they had purchased the lots for $14,000, would any one contend the $2000 advance, or profit, was usury? We apprehend not. Such a transaction would be upheld by all legitimate rules of business. We suppose that such a transaction has never been condemned in morals or law; and when we look to substance, where, in principle, can we distinguish that from this case? No distinction can be taken in reason or justice. A person owning and selling property may undeniably take security for the payment of the purchase money without converting the transaction into a loan. And for the same reason, where one person purchases land for another, on an agreement that the person for whom the purchase is made will pay a specified price, and secure the payment by pledge of other land, there is not a single ingredient of a loan.

From what has been said it follows that Eames and Spaulding have a right to recover the balance due them after deducting the amount received from Trumbo, and on the judgment against Cushman. Hardin is still indebted to them for that balance. He induced them to advance their money to purchase the land for him, and they have a right to recover it with interest, and also the $2000 he agreed to advance on the price they paid for the lots,—in other words, to receive the amount Hardin agreed to pay them, less the amount they

received from Trumbo and on the Cushman judgment. This is fair and just, and Hardin must be held to its payment. Had it been a loan, there would have been usury, and a forfeiture of all interest on the amount advanced; but being a purchase by appellants, and a sale to Hardin, there can be no forfeiture of any kind, or for any amount. Hardin having failed to perform his part of the agreement, they have a right to be reimbursed by receiving at least the contract price.

As to lots 11 to 13, inclusive, the decree of the court requiring Spaulding to convey them to Hardin in trust for Winslow we think was correct. Winslow furnished the money to make the redemption, under which the title was obtained, and Spaulding held the title merely as a trustee.

It is claimed, however, by appellants, that after Spaulding had obtained the title to these three lots, an agreement was made with Hardin that Spaulding should hold the lots as security for payment of certain taxes on lots 4 to 10, inclusive, and the eighty acres deeded to Eames and Spaulding, and also as security for the release of certain judgments which appeared to be liens against the eighty acres. It will not be necessary to determine whether Hardin could, without the consent of Winslow, make a binding contract with Spaulding, who knew the rights of Winslow in the property, as it appears from the evidence that the taxes in question had been paid before the filing of the bill, and also evidence furnished of the satisfaction of the judgments. If, therefore, the agreement alleged to have been made was obligatory, which we are inclined to think was not, it has been substantially performed, and Spaulding has no right to hold the title to the three lots.

As to the eighty-acre tract and the six lots in Johnson's subdivision described in the bill, they are still held by Eames and Spaulding as security for the payment of the balance due them from Hardin, and we are satisfied that a decree should have been rendered, under the cross-bill, for a sale of the eighty acres and the six lots. The eighty acres should

first be sold, and if it fails to bring enough to satisfy the amount due, then the six lots should be sold, or so many as may be necessary to satisfy the amount due.

The judgment of the Appellate Court will be reversed, and the cause remanded.

*Judgment reversed.*